UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

TERRY DAUM,

|  |  |  |
|---|---|---|
|  | Plaintiff, | REPORT and RECOMMENDATION |
| v. |  | |

SERGEANT JOHN DOE,                                    13-CV-00088V(F)
CORRECTION OFFICER HOLTZ,
CORRECTION OFFICER HEHLER, and
JOHN DOE CORRECTION OFFICERS 1-2,

                                    Defendants.
_____

APPEARANCES:          STOLL, GLICKMAN & BELLINA, LLP
                      Attorneys for Plaintiff
                      NICHOLAS HENRY MINDICINO, of Counsel
                      475 Atlantic Avenue, 3rd Floor
                      Brooklyn, New York  11217

                      ERIC T. SCHNEIDERMAN
                      ATTORNEY GENERAL, STATE OF NEW YORK
                      Attorney for Defendants
                      GEORGE MICHAEL ZIMMERMANN
                      Assistant Attorney General, of Counsel
                      350 Main Street
                      Suite 300A
                      Buffalo, New York  14202

## JURISDICTION

This case was referred to the undersigned on October 29, 2014, by Honorable

Richard J. Arcara,[1] for all pretrial matters including preparation of a report and

recommendation on dispositive motions.  The matter is presently before the court on

Defendants' motion for summary judgment (Dkt. 22), filed October 17, 2014.

_____
[1] On  March 8, 2016, the case was reassigned to Honorable Lawrence J. Vilardo.

## BACKGROUND

Plaintiff commenced this civil rights action pursuant to 42 U.S.C. § 1983, on January 28, 2013, alleging Defendants, employees of New York Department of Corrections and Community Supervision ("DOCCS"), subjected Plaintiff to unnecessary force in violation of the Eighth Amendment's prohibition against cruel and unusual punishment.  Amended Complaints were filed on May 16, 2013 (Dkt. 4) ("First Amended Complaint"), and July 2, 2013 (Dkt. 6) ("Second Amended Complaint"), to correct the identities of Defendants.  In particular, the Second Amended Complaint asserts claims against Corrections Officers ("C.O.") Holtz ("Holtz"), Zehler ("Zehler"), and John Does 1 and 2, as well as Sergeant John Doe.  On August 1, 2013, Holtz and Zehler ("Defendants"), filed an answer (Dkt. 8).

On August 14, 2014, Defendants filed the instant motion for summary judgment (Dkt. 22) ("Defendants' Motion"), attaching Defendants' Memorandum of Law in Support of Motion for Summary Judgment (Dkt. 22-1) ("Defendants' Memorandum"), the Statement of Undisputed Facts (Dkt. 22-2) ("Defendants' Statement of Facts"), the Declaration of Joseph Chisholm (Dkt. 22-3) ("Chisholm Declaration"), and the Declaration of Assistant Attorney General ("A.A.G.") George Michael Zimmermann (Dkt. 22-4) ("Zimmermann Declaration"), attaching exhibit A ("Defendants' Exh. A").  On October 17, 2014, Plaintiff filed the Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment (Doc. No. 25) ("Plaintiff's Memorandum"), the Declaration of Nicholas Mindicino, Esq. (Dkt. 25-1) ("Mindicino Declaration"), attaching exhibits A through K ("Plaintiff's Exh(s). __"), and Plaintiff's Response to Defendants' Statement of Undisputed Facts Pursuant to Local Civil Rule 56.1 (Dkt. 25-2) ("Plaintiff's

Statement of Facts").   On November 7, 2014, Defendants filed Defendants' Reply

Memorandum of Law in Further Support of Motion for Summary Judgment (Dkt. 27)

("Defendants' Reply").   Oral argument was deemed unnecessary.

Based on the foregoing, Defendants' motion should be DENIED in part and

GRANTED in part.

# **FACTS**[2]

On November 20, 2011, Plaintiff Terry Daum ("Plaintiff" or "Daum"), was in the

custody of DOCCS, and incarcerated in the general prison population at Attica

Correctional Facility ("Attica" or "the correctional facility"), where Holtz and Zehler

("Defendants") were employed as DOCCS Corrections Officers and working in D-block,

the cell block to which Plaintiff was assigned.   At 7:05 P.M., most of the inmates in

Plaintiff's cell block were released to Attica's prison yard for yard time.   Those inmates

who were scheduled for showers or telephone calls, or who were working as porters,

including Plaintiff, were not released for yard time and remained locked in their

respective cells.

At 7:15 P.M., during the November 20, 2011 yard run, Plaintiff, who remained

locked in his cell, was ordered by an unidentified corrections officer to go downstairs to

the housing block's lobby area.   Plaintiff did as instructed and upon arriving in the lobby

area, was met by four Corrections Officers, including Defendants Zehler and Holtz, as

well as John Does 1 and 2 ("John Doe Defendants"), and an unidentified Sergeant

standing nearby.   Zehler instructed Plaintiff to get into position against the wall to be

frisked.   Plaintiff complied and Zehler then aggressively frisked Plaintiff, removing from

---

[2] Taken from the pleadings and motion papers filed in this action.

3

Plaintiff's pockets several items of non-contraband, including Plaintiff's identification, a pen, and a telephone list, which Zehler threw onto the floor.  After completing the frisk, Zehler tapped Plaintiff on the shoulder, indicating the search was complete and Plaintiff could retrieve his property from the floor.  As Plaintiff turned to his right and reached down to pick up his property from the floor, Zehler punched Plaintiff in the face and Plaintiff fell to the floor.  Zehler and the John Doe Defendants forcibly pinned Plaintiff to the ground, and Zehler stated to Plaintiff, "this was way overdue."  Zehler and the John Doe Defendants then stood Plaintiff up, Zehler asked whether Plaintiff had any problem with what had just transpired, and Plaintiff responded that he would not make any trouble for the Corrections Officers.  Zehler threatened to kill Plaintiff if Plaintiff told anyone what had happened, and Holtz confirmed Zehler's threat, adding the Corrections Officers "would get away with it because plaintiff has prior charges of assault on staff in his inmate record."  Complaint ¶ 16.  Plaintiff was then escorted back to his cell.

Although Plaintiff requested medical attention for his injury, he was not immediately taken to the medical unit but, instead, was escorted back to his cell where Plaintiff was questioned by the unidentified Sergeant who had been present during the incident.  Despite witnessing the assault, the Sergeant asked Plaintiff why he needed to visit the medical clinic, and Plaintiff, afraid of retaliation by Holtz and Zehler, responded that he fell and injured himself.  The Sergeant responded, "good answer," and instructed the Corrections Officers to escort Plaintiff for medical treatment.

Plaintiff was taken to the Attica medical clinic where Plaintiff informed the nurse he was injured after slipping and falling in the shower.  The nurse who tended to Plaintiff

noted Plaintiff's right eye was slightly swollen and bruised with a ½ inch laceration underneath the right eye.  After the injury was cleaned and bandaged, Plaintiff was given Motrin for pain and instructed to apply ice for the swelling.  Plaintiff was escorted back to his cell.  The next day Plaintiff was taken to Erie County Medical Center ("ECMC"), in Buffalo, New York where he again told the medical personnel who attended to him that he slipped and fell in the shower.  While at ECMC, Plaintiff underwent a CT scan and was diagnosed with a right orbital floor fracture with inferior rectus muscle entrapment, *i.e.*, a fractured orbital bone in his face for which Plaintiff underwent surgical repair at ECMC on December 7, 2011.

In is undisputed that Plaintiff did not file any grievance regarding the incident pursuant to DOCCS's Inmate Grievance Program ("IGP"), while Plaintiff was incarcerated at Attica.  At some unspecified time after the incident, Plaintiff was interviewed by an officer with the DOCCS Inspector General's office ("IG"), who questioned Plaintiff regarding his injury.  The Corrections Officer who escorted Plaintiff to the interview with the IG remained nearby, within earshot of Plaintiff and the IG. Because the interview occurred at Attica and in the presence of a Corrections Officer, a fact known to Plaintiff, Plaintiff again feared retaliation at the hands of Holtz and Zehler if he reported the true cause of his injury, so Plaintiff stated to the IG only that he fell in the shower.  After Plaintiff's meeting with the IG, the Sergeant commended Plaintiff on his interview with the IG.

On December 28, 2011, Plaintiff requested medical hold that had been placed against Plaintiff be removed to permit Plaintiff to be transferred from Attica, asserting Plaintiff's transfer request had been approved.  On January 23, 2012, Plaintiff was

transferred from Attica to Sing Sing Correctional Facility ("Sing Sing").  On January 27,

2012, then incarcerated at Sing Sing, Plaintiff filed an Inmate Grievance ("Grievance"),[3]

complaining about the incident at Attica.  In the grievance, Plaintiff explained that he did

not earlier file a grievance while incarcerated at Attica because he feared retaliation,

including that the Corrections Officers involved in the incident would kill him, as

threatened.  By letter dated February 1, 2012 ("February 1, 2012 Letter"),[4] DOCCS IGP

Suervisor G. Ter Bush ("Bush") advised Plaintiff that the Grievance was being returned

as untimely filed, and recommended Plaintiff contact the Inspector General in Albany

who would be better equipped to assist Plaintiff with the matter.  Because Bush's

rejection of Plaintiff's Grievance as time-barred meant Plaintiff could not file an appeal

pursuant to the IGP, Plaintiff, on February 11, 2012, sent Bush a letter ("February 11,

2012 Letter")[5] asserting his fear of retribution prevented Plaintiff from filing an Inmate

Grievance regarding the incident while incarcerated at Attica, which should have been

considered as mitigating the need for Plaintiff to comply with the IGP.  When Plaintiff did

not receive any response to the February 11, 2012, Letter, Plaintiff, by letter dated

February 17, 2012 ("February 17, 2012 Letter"),[6] inquired as to the status of the

February 11, 2012 Letter, to which Plaintiff referred as a "grievance."  Plaintiff again did

not receive any response to the February 17, 2012 Letter, prompting Plaintiff to write

another letter on March 5, 2012 ("March 5, 2012 Letter").[7]  In a Memorandum dated

March 9, 2012 ("March 9, 2012 Memorandum"),[8] Bush advised he had on file Plaintiff's

---

[3] Plaintiff's Exh. C, Dkt. 25-1 at 15.
[4] Plaintiff's Exh. C, Dkt. 25-1 at 16.
[5] No copy of the February 11, 2012 Letter is in the record, although Bush admitted receiving it.  *See* Dkt. 25-1 at 19 (Memorandum from Bush to Plaintiff advising Bush had on file the February 11, 2012 Letter).
[6] Plaintiff's Exh. C, Dkt. 25-1 at 17.
[7] Plaintiff's Exh. C, Dkt. 25-1 at 18.
[8] Plainitff's Exh. C, Dkt. 25-1 at 19.

February 11, and March 5, 2012 Letters, which were not considered as Inmate

Grievances, and advised Plaintiff that mitigating circumstances in filing a late grievance

could only be considered up to 45 days after the deadline for filing a grievance.  March

9, 2012 Memorandum.  Because Plaintiff's Grievance was filed 78 days late, no

mitigating circumstances regarding the late filing could, according to Bush, be

considered.  *Id.*  By letter to DOCCS's Superintendent of Health dated March 12, 2012

("March 12, 2012 Letter"),[9] Plaintiff recounted his attempts to grieve the incident

pursuant to the IGP, attributing the delay in filing his Grievance to the threats directed

by Defendants at Attica against Plaintiff's life should he complain about the incident.

March 12, 2012 Letter at 1-2.  Plaintiff further asserted Bush was not seriously

considering the mitigating circumstances, and requested either Bush be removed from

his official duties, or Plaintiff's late Grievance be accepted.  *Id.* at 2.  This action

followed.


## DISCUSSION

Summary judgment of a claim or defense will be granted when a moving party

demonstrates that there are no genuine issues as to any material fact and that a moving

party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a) and (b); *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 250-51 (1986); *Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 300 (2d Cir.

2003).  The court is required to construe the evidence in the light most favorable to the

non-moving party.  *Collazo v. Pagano*, 656 F.3d 131, 134 (2d Cir. 2011).  The party

moving for summary judgment bears the burden of establishing the nonexistence of any

---

[9] Plaintiff's Exh. C, Dkt. 25-1 at 20-21.

genuine issue of material fact and if there is any evidence in the record based upon any source from which a reasonable inference in the non-moving party's favor may be drawn, a moving party cannot obtain a summary judgment.  *Celotex*, 477 U.S. at 322; *see Anderson*, 477 U.S. at 247-48 ("summary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party").  "A fact is material if it 'might affect the outcome of the suit under governing law.'"  *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008) (quoting *Anderson*, 477 U.S. at 248).

"[T]he evidentiary burdens that the respective parties will bear at trial guide district courts in their determination of summary judgment motions."  *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988)).  A defendant is entitled to summary judgment where "'the plaintiff has failed to come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on'" an essential element of a claim on which the plaintiff bears the burden of proof.  *In re Omnicom Group, Inc., Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010) (quoting *Burke v. Jacoby*, 981 F.2d 1372, 1379 (2d Cir. 1992)).  Once a party moving for summary judgment has made a properly supported showing of the absence of any genuine issue as to all material facts, the nonmoving party must, to defeat summary judgment, come forward with evidence that would be sufficient to support a jury verdict in its favor.  *Goenaga v. March of Dimes Birth Defects Foundation*, 51 F.3d 14, 18 (2d Cir. 1995).  "[F]actual issues created solely by an affidavit crafted to oppose a summary judgment motion are not 'genuine' issues for trial."  *Hayes v. New York City Dept. of Corrections*, 84 F.3d 614, 619 (2d Cir. 1996).

Defendants argue in support of summary judgment that Plaintiff's failure to exhaust administrative remedies requires dismissal of Plaintiff's claims, Defendants' Memorandum at 4-7, that Plaintiff's allegations fail to demonstrate Defendants should be estopped from asserting the failure to exhaust administrative remedies defense, *id.* at 7-10, the failure to intervene claim should be dismissed as against Holtz, *id.* at 10-11, and the record is devoid of any evidence that Holtz used excessive force on Plaintiff.  *Id.* at 11-12.  In opposing summary judgment, Plaintiff argues there exist genuine issues of material fact as to whether Plaintiff's failure to exhaust administrative remedies falls within one of the three exceptions to the administrative exhaustion requirement, Plaintiff's Memorandum at 7-10, including that Defendants directed death threats toward Plaintiff if he complained about the incident, *id.* at 10-13, such that Defendants should be estopped from asserting as an affirmative defense Plaintiff's failure to exhaust administrative remedies, *id.* at 13-15, and the alleged death threats rendered the IGP's administrative remedies unavailable.  *Id.* at 15.  Plaintiff also withdraws all claims that Holtz personally assaulted Plaintiff, yet maintain Plaintiff's claims that Holtz conspired with Zehler's assault of Plaintiff and failed to protect Plaintiff from the excessive use of force.  *Id.* at 15-16.  In further support of summary judgment, Defendants argue they cannot be estopped from raising an affirmative defense doctrine based on the actions of others, Defendants' Reply at 1-2, that Plaintiff never alleged any conspiracy in the Second Amended Complaint, *id.* at 2-3, that any conspiracy would be barred by the intra-agency conspiracy doctrine, *id.* at 3-4, and Plaintiff fails to assert any issues of fact that could establish Holtz failed to protect Plaintiff.  *Id.* at 4-5.

**2.      Failure to Exhaust Administrative Remedies**

Defendants argue that Plaintiff, by failing to timely exhaust administrative remedies with regard to his claims as required under the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), is precluded from seeking juridical review of such claims.  Defendants' Memorandum at 4-7.  Defendants further argue Plaintiff's allegations fail to demonstrate Defendants are estopped from asserting Plaintiff's failure to exhaust administrative remedies as an affirmative defense.  *Id.* at 7-10.  In opposition to summary judgment, Plaintiff argues Defendants' death threats rendered the IGP's administrative remedies unavailable to him and estop Defendants from raising Plaintiff's failure to exhaust administrative remedies as an affirmative defense.  Plaintiff's Memorandum at 7-15.  In further support of summary judgment, Defendants maintain they cannot be estopped from raising the failure to exhaust affirmative defense based on the actions of others.  Defendants' Reply at 1-2.

Pursuant to the Prison Litigation Reform Act, 42 U.S.C. § 1997e ("PLRA"), "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  This administrative exhaustion requirement "'applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.'"  *Espinal v. Goord*, 558 F.3d 119, 124 (2d Cir. 2009) (quoting *Porter v. Nussle*, 534 U.S. 516, 532 (2002)).  Nevertheless, "the PLRA does not require the exhaustion of all administrative remedies, but only those that are 'available' to the inmate."  *Hubbs v. Suffolk County Sheriff's Dept.*, 788 F.3d 54, 59

(2d Cir. 2015).  "'To be 'available' under the PLRA, a remedy must afford 'the possibility of some relief for the action complained of.'"  *Hubbs*, 788 F.3d at 59 (quoting *Abney v. McGinnis*, 380 F.3d 663, 667 (2d Cir. 2004)).

The PLRA's exhaustion requirement is not jurisdictional, but is an affirmative defense that may be waived or subjected to certain defenses such as estoppel.  In particular, the Second Circuit has recognized that the PLRA's administrative exhaustion requirement is not mandatory

> when (1) administrative remedies are not available to the prisoner; (2) defendants have either waived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; or (3) special circumstances, such as a reasonable misunderstanding of the grievance procedures, justify the prisoner's failure to comply with the exhaustion requirement.

*Ruggiero v. County of Orange*, 467 F.3d 170, 175 (2d Cir. 2006) (citing *Hemphill v. New York*, 380 F.3d 680, 686 (2d Cir. 2004)).

The same facts regarding whether an inmate has exhausted available administrative remedies "'sometimes fit into more than one of these categories' and significant overlap may occur."  *Rickett v. Orsino*, 2013 WL 1176059, at *9 (S.D.N.Y. Feb. 20, 2013) (quoting *Giano v. Goord*, 380 F.3d 670, 677 n. 6 (2d Cir. 2004)), *report and recommendation adopted by* 2013 WL 1155354 (S.D.N.Y. Mar. 21, 2013)).  Further, "[f]actual disputes relating to whether a prisoner's failure to exhaust should be excused can generally be resolved by the court, and do not ordinarily present a jury question." *Id.* (citing *Messa v. Goord*, 652 F.3d 305, 308-10 (2d Cir. 2011)).  The court thus considers whether Plaintiff's failure to exhaust administrative remedies is excused under any of the three exceptions recognized by the Second Circuit to the exhaustion requirement, and whether this issue should be resolved by the court as a pretrial matter.

Generally, "[w]hether an administrative remedy was available to a prisoner in a particular prison or prison system is ultimately a question of law, even when it contains factual elements." *Hubbs*, 788 F.3d at 59 (citing *Snider v. Melindez*, 199 F.3d 108, 114 (2d Cir. 1999)).   "Because failure to exhaust is an affirmative defense, defendants bear the initial burden of establishing, by pointing to 'legally sufficient source[s]' such as statutes, regulations, or grievance procedures, that a grievance process exists and applies to the underlying dispute."  *Id.* at 59 (quoting *Giano v. Goord*, 380 F.3d 670, 675 (2d Cir. 2004), and citing *Mojias v. Johnson*, 351 F.2d 606, 610 (2d Cir. 2003), and *Snider*, 199 F.3d at 114).  Here, Defendants sufficiently explain the three-tiered grievance process available under DOCCS regulations, specifically 7 NYCRR § 701.5. Defendants' Memorandum at 5-6.[10]  All three levels of inmate grievance procedures must be exhausted prior to commencing litigation in federal court.  *Guarneri v. West*, 782 F.Supp.2d 51, 59 (W.D.N.Y. 2011) (citing cases).  Plaintiff does not challenge the three-tier grievance process under DOCCS regulations.  Defendants have thus met their burden of establishing the existence of a nominally available grievance procedure and the burden thus shifts to Plaintiff to demonstrate factors that his failure to exhaust falls within one of the three exceptions.

---

[10] As Defendants explain, an inmate is required to file a grievance within 21 days of an alleged incident, Defendants' Memorandum at 5-6 (citing 7 NYCRR § 701.5(a)(1)), or to request from the IGP supervisor an extension to the time limit for filing a grievance within 45 days of the alleged incident based on mitigating circumstances.  *Id.* (citing 7 NYCRR § 701.6(g)(1)(i)(*a*).  After a grievance is filed, the Inmate Grievance Review Committee ("IGRC"), has 16 days to informally resolve.  *Id.* (citing 7 NYCRR § 701.5(b)(1)-(4)).  An inmate who disagrees with the IGRC's determination has seven days after receipt of the IGRC's written determination to file an appeal with the correctional facility's superintendent, *id.* (citing 7 NYCRR § 701.5(c)(1)), who has 20 days within which to respond.  *Id.* (citing 7 NYCRR § 701.5(c)(3)). If upon receipt of the superintendent's written decision the inmate remains dissatisfied, he has seven days to appeal to the Central Office Review Committee ("CORC"), *id.* at 5-6 (citing 7 NYCRR § 701.5(d)(1), which then has 30 days in which to issue a written decision.  *Id.* at 6 (citing 7 NYCRR § 701.5(d)(2)).

Although Defendants have met this initial burden of establishing the existence of an administrative remedies scheme, "administrative remedies may nonetheless be deemed unavailable if the plaintiff can demonstrate that other factors – for example, threats from corrections officers – rendered a nominally available procedure unavailable as a matter of fact."  *Hubbs* , 788 F.3d at 59 (citing *Hemphill v. New York*, 380 F.3d 680, 688 (2d Cir. 1994)).  Particularly relevant to the instant case is that

> threats or other intimidation by prison officials may well deter a prisoner of "ordinary firmness" from filing an internal grievance, but not from appealing directly to individuals in positions of greater authority within the prison system, or to external structures of authority such as state or federal courts.  This may be so, if for no other reason, because seeking a criminal investigation or filing a civil rights complaint may enable an inmate to draw outside attention to his complaint, thereby neutralizing threatened retaliatory conduct from prison employees.

*Hemphill*, 380 F.3d at 688 (quoting *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003)).

Specifically, that Plaintiff, on November 20, 2011, sustained a fractured orbital bone requiring surgical repair is not disputed.  Plaintiff claims that Zehler delivered the physical blow causing the fracture in an unprovoked assault in which Holtz and the John Doe Defendants participated by arranging for the assault to occur in a secluded area of the correctional facility, while the majority of the inmates were in the yard.  Plaintiff further claims that after the assault, he was threatened by multiple DOCCS employees, including Zehler, Holtz, and other, unspecified Corrections Officers and a sergeant, not to disclose the true nature of his injury, or Plaintiff would be killed.  That Plaintiff's injury was investigated by the IG office while Plaintiff remained at Attica and before Plaintiff filed the Grievance, as well as that Bush, in the February 1, 2012 Letter recommended Plaintiff, then incarcerated at SingSing, contact the Inspector General in Albany who would be better equipped to assist Plaintiff with the matter, indicates the nature of the

injury raised the suspicion of some DOCCS's personnel as to Plaintiff's assertion that it was sustained after slipping in the shower, thus giving credence to Plaintiff's excessive force claim. Plaintiff's requesting of early release from the medical hold placed on him after the November 20, 2011 incident to allow Plaintiff to be transferred to a different correctional facility, and, upon being transferred to SingSing and outside the presence of Defendants and, thus, no longer subjected to the threats Defendants allegedly directed toward Plaintiff, wasted no time – three days – in filing the Grievance, strongly suggests that but for the alleged threats, Plaintiff would have timely exhausted the administrative remedies in compliance with the PLRA while housed at Attica.

Plaintiff's allegations are corroborated by another Attica inmate, one Akeem Ulmer ("Ulmer"), who avers that at 7:00 P.M., on November 20, 2011, Ulmer, while proceeding from his cell, D-block on 42 company, 42 cell, toward the front gate to use the telephone, observed the company officer direct Plaintiff to go downstairs, and Plaintiff complied with the order.  Ulmer Affidavit[11] ¶¶ 3-5.  After using the telephone and returning to his cell a short time later, Ulmer observed two corrections officers escorting Plaintiff back to Plaintiff's cell where Plaintiff locked in and the corrections officers left. *Id.* ¶ 6.  The next morning, Ulmer perceived something was wrong because Plaintiff, who was the company porter, was not distributing hot water before the morning meal in accordance with the morning routine.  *Id.* ¶ 7.  When the company cell gates were opened for the morning meal, Ulmer proceeded to Plaintiff's cell to inquire why Plaintiff did not distribute the hot water, but before Ulmer could pose his question, Plaintiff asked Ulmer to advise the company officer that there was an emergency and Plaintiff needed to go to the correctional facility's medical clinic.  *Id.*  Ulmer asked Plaintiff what the

---

[11] Plaintiff's Exh. K.

problem was, and Plaintiff responded that when he went downstairs the previous evening as directed by the corrections officers, Plaintiff was assaulted, and that he woke up coughing up blood. *Id.* Ulmer then, as requested by Plaintiff, went to the company officer and reported that Plaintiff needed emergency medical assistance. *Id.* Ulmer proceeded to the mess hall for the morning meal and upon returning to his cell, noticed Plaintiff was not in his cell, which Ulmer understood meant Plaintiff had been escorted to the medical clinic. *Id.* ¶¶ 7-8. Three weeks later, Plaintiff underwent surgery on his right eye, and three days after the surgery, Plaintiff was removed from the D-block area. *Id.* ¶¶ 9-10.

If, as Plaintiff alleges, the fractured orbital was sustained by an unprovoked blow delivered by Zehler, and immediately followed by threat of additional physical assaults and death by Zehler, Holtz, and the John Doe Defendants, the serious nature of Plaintiff's injury and subsequent threats could cause a prisoner of ordinary firmness to conclude that the IGP grievance procedures were not available to Plaintiff, at least while Plaintiff remained incarcerated at Attica, thereby excusing Plaintiff's failure to timely file either a grievance or a request for an extension of time in which to file such grievance. *See Rickett*, 2013 WL 1176059, at * 22 (recommending failure to grieve assault and retaliation claims be excused because threats of further physical assault rendered correctional facility's grievance procedures unavailable). The same disputed fact issues, if established, also would estop Plaintiff from raising the affirmative defense of failure to exhaust. *See Ziemba v. Wezner*, 366 F.3d 161, 164 (2d Cir. 2004) (holding the affirmative defense of exhaustion of administrative remedies under the PLRA is subject to estoppel), *on remand* 2006 WL 860091, at * 3 (D.Conn. Mar. 31, 2006)

(holding genuine issues of material fact existed as to whether defendant prison employees were estopped from raising affirmative defense of failure to exhaust administrative remedies where affidavits submitted by the plaintiff indicated both grievances the plaintiff submitted regarding threats of violence directed toward the plaintiff by his cell mate were not processed by prison officials but were returned to the plaintiff).  The disputed facts issues also call into question whether Plaintiff's failure to exhaust administrative remedies is excused by special circumstances.  *See*, *e.g.*, *Casey v. Brockley*, 2015 WL 8008728, at * 6 (N.D.N.Y. Nov. 9, 2015) ("generally, the 'special circumstances' doctrine is applied where a prisoner has been threatened with physical retaliation for exhausting administrative remedies or where the prisoner reasonably misinterprets the statutory requirements of the appeals process." (citing *Giano*, 380 F.3d at 676)).  Accordingly, these overlapping, if not the same, issues of fact regarding whether the administrative remedies were, in fact, available to Plaintiff, as well as whether Defendants should be estopped from asserting as an affirmative defense Plaintiff's failure to exhaust administrative remedies, or special circumstances exist excusing Plaintiff's failure to exhaust, prevent summary judgment based on Plaintiff's failure to exhaust.

Furthermore, the issue of whether Plaintiff's failure to exhaust administrative remedies is within one of the three exceptions to the PLRA's administrative exhaustion requirement is for the jury to decide.  In particular, "the Seventh Amendment's guarantee of the right to 'the ultimate determination of issues of fact by the jury,' does not extend to the 'threshold issue[s] that *courts* must address to determine whether litigation is being conducted in the right forum at the right time.'"  *Messa v. Goord*, 652

F.3d 305, 309 (2d Cir. 2011) (quoting *In re Peterson*, 253 U.S. 300, 309-10 (1920), and *Dillon v. Rogers*, 596 F.3d 260, 272 (5th Cir. 2010) (italics in original)).  Rather, "'[j]uries decide cases, not issues of judicial traffic control.'"  *Id.* (quoting *Pavey v. Conley*, 544 F.3d 739, 741 (7th Cir. 2011).  The Second Circuit, nevertheless, has strongly implied that where the factual issues relating to exhaustion are intertwined with the merits of an underlying excessive force claim, the disputed factual material may convert exhaustion into a jury issue.  *Id.* (holding the Seventh Amendment was not violated where disputed factual issues regarding exhaustion were determined by the District Judge at an evidentiary hearing held on the eve of trial because "the factual disputes relating to exhaustion are not intertwined with the merits of [the plaintiff's] underlying excessive force claim.").[12]

Submitting a factual dispute on a preliminary issue to the jury is not without legal precedent.  In *Environmental Renewal, Inc. v. Pyramid Crossgates Co.*, 436 F.3d 82, 88 (2d Cir. 2006), the Second Circuit remanded for further proceedings a defendant's motion to dismiss for lack of subject matter jurisdiction which put plaintiff's Article III standing in issue, instructing that the district court could proceed by (1) resolving the motion on affidavits; (2) if genuine issues of material fact are disputed, conducting a

---

[12] The Second Circuit's holding in *Messa* that the disputed material issues of fact regarding whether the inmate plaintiff was, based on alleged threats of further violence, excused from exhausting administrative remedies as to his Eighth Amendment excessive force claim should not be submitted to the jury, is readily distinguishable from the facts in the instant case.  Specifically, in *Messa*, the Plaintiff contended only that unidentified prison employees, *e.g.*, "a warden and an individual in the infirmary that was wearing a blue uniform," threatened him.  *Messa v. LeClaire*, 2007 WL 2292975, at * 4 (N.D.N.Y. Feb. 26, 2007), *report and recommendation adopted by* 2007 WL 2288106 (N.D.N.Y. Aug. 6, 2007).  In contrast, in the instant case, Plaintiff plainly alleges that both Zehler and Holtz threatened Plaintiff with death if he complained of the November 20, 2011 incident.  *See*, *e.g.*, Second Amended Complaint ¶ 20 ("Zehler threatened Mr. Daum not to report the incident or else they could easily kill him.  Holtz added that it would be easy to kill Mr. Daum and get away with it because no one would believe him."), and ¶ 23 ("Mr. Daum feared for his life and believed that officers Zehler, Holtz and the unnamed officers and sergeant would retaliate against Mr. Daum with deadly physical force if he reported the incident while at Attica Correctional Facility based on this assault which caused serious injury.").

hearing limited to Article III standing; (3) where evidence regarding standing overlaps with evidence on merits, proceed to trial and make a jurisdictional ruling at the close of evidence; (4) where the overlapping evidence is such that fact-finding on the jurisdictional issue will result in adjudicating the factual issues on the merits which are required by the Seventh Amendment to be resolved by the jury, leave the jurisdictional issue for trial; or (5) make a preliminary finding on the jurisdictional facts, subject to revision later in proceedings or at trial.  *See also Robinson v. Metro-North Commuter R.R. Co.*, 267 F.3d 147, 170 n. 14 (2d Cir. 2001) (quoting *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 423 n. 21 (5th Cir. 1998) ("The existence of common factual *issues* is to be distinguished from the existence of overlapping *evidence*.  For purposes of the Seventh Amendment, the question is whether factual issues overlap, thus requiring one trier-of-fact to decide a disputed issue that must be decided by a subsequent jury, not whether the two fact-finders will merely have to consider similar evidence in deciding distinct issues.")), *overruled in part on other grounds by Wal-Mart v. Dukes*, __ U.S. __, 131 S.Ct. 2541 (2011).

In the instant case, the disputed facts on which Plaintiff relies in explaining his failure to exhaust, *i.e.*, that Defendants had threatened Plaintiff with further physical assaults and death if Plaintiff complained to anyone about the November 20, 2011 incident, requires a credibility determination of essentially the same disputed facts on which Plaintiff's predicate Eighth Amendment excessive force claim are based as to be inextricably intertwined.  *Messa*, 652 F.3d at 309.  Under these circumstances, resolution of the exhaustion issue at a pretrial evidentiary hearing would run so perilously close to resolving the disputed issues of material facts on Plaintiff's

substantive Eighth Amendment claim as to violate the Supreme Court's admonition that on summary judgment, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255.  *See Rickett v. Orsino*, 2013 WL 1176059, at *22-23 (S.D.N.Y. Feb. 20, 2013) (recommending issue of exhaustion of administrative remedies be determined at trial because factual issues regarding exhaustion overlapped issues on the merits of the underlying Eighth Amendment excessive force claim), *report and recommendation adopted by* 2013 WL 1155354, at * (S.D.N.Y. Mar. 21, 2013).  Nor would permitting the jury to resolve the administrative exhaustion where the issues regarding exhaustion are identical to those pertaining to the substantive claim run afoul of "Congress's reasons for requiring administrative exhaustion, which are to (1) encourage inmates to pursue administrative steps that they might otherwise prefer to skip; (2) provide prisons with a fair opportunity to correct their errors; and (3) reduce the quantity and improve the quality of prisoner suits."  *Messa*, 652 F.3d at 609 (internal quotation marks and citations omitted).  Rather than resulting in "'a series of jury trials before there was a trial on the merits,'" *id.* (quoting *Pavey*, 544 F.3d at 741), whether Plaintiff's failure to exhaust administrative remedies is within one of *Hemphill's* three exceptions as well as the merits of Plaintiff's Eighth Amendment excessive force claim, which turn on the same credibility issues, can be resolved by the jury in a single trial.

Accordingly, summary judgment should be DENIED insofar as Plaintiff failed to exhaust administrative remedies.  The parties should proceed to trial on Plaintiff's Eighth Amendment excessive force claim.

### 3.      Conspiracy Claim

Plaintiff, in opposing summary judgment, withdraws all claims that Holtz

personally used excessive force against Plaintiff, yet asserts that Holtz conspired with

Zehler in Zehler's use of excessive force and in failing to protect Plaintiff from such use.

Defendants' Memorandum at 16-17.  Defendants argue in further support of summary

judgment that even if Plaintiff had pleaded a conspiracy claim in the Second Amended

Complaint, such claim is barred by the intra-corporate conspiracy doctrine, rooted in the

conspiracy provision of Section One of the Sherman Antitrust Act, 15 U.S.C. § 1,

providing an entity cannot conspire with one or more of its employees acting within the

scope of employment.  Defendants' Reply at Memorandum at 3-4.  The court need not

address whether the intra-agency conspiracy doctrine bars Plaintiff's claim because the

conspiracy claim fails on a more fundamental point as discussed below.

Although not specifically stated as such, Plaintiff's conspiracy claim is brought

pursuant to 42 U.S.C. § 1985(3) ("§ 1985(3)") which proscribes a conspiracy to deprive

a person of any rights or privileges under the laws.  The four elements of a § 1985(3)

claim include

> (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any
> person or class of persons of equal protection of the laws, or of equal privileges
> and immunities under the laws; (3) an act in furtherance of the conspiracy; (4)
> whereby a person is either injured in his person or property or deprived of any
> right of a citizen of the United States.  Furthermore, the conspiracy must also be
> motivated by 'some racial or perhaps otherwise class-based, invidious
> discriminatory animus behind the conspirators' actions.'

*Mian v. Donaldson, Lufkin & Jenrette Securities Corp.*, 7 F.3d 1085, 1087-88 (2d Cir.
1993) (citing and quoting *United Bd. of Carpenters, Local 610 v. Scott*, 463 U.S. 825,
828-29 (1983)).

Significantly, in the instant case, the record is devoid of any evidence establishing the requisite "racial or [ ] otherwise class-based invidious discriminatory animus" motive. *See Harrison v. Lutheran Medical Center*, 468 Fed.Appx. 33, 37 (2d Cir. Mar. 14, 2014) (citing *United Bd. of Carpenters, Local 610*, 463 U.S. at 828, in affirming district court's dismissal for failure to state a claim § 1985(3) conspiracy claim in the absence of any allegation of facts supporting requisite motive).

Summary judgment thus should be GRANTED in favor of Defendants insofar as Plaintiff alleges a conspiracy under § 1985(3).

## 4.   Failure to Protect

Plaintiff claims Defendant Holtz, who was present when Plaintiff was assaulted, failed to intervene to prevent the assault on November 20, 2011.  Second Amended Complaint ¶ 9.  Defendants argue in support of summary judgment on this claim that Plaintiff's own deposition testimony establishes only that Holtz was standing near the door to the lobby where the allege assault occurred, and that the alleged assault of Plaintiff occurred too quickly to permit Holtz an opportunity to intervene and prevent the assault.  Defendants' Memorandum at 10-11 (citing *O'Neill v. Krzeminski*, 839 F.2d 9, 11 (2d Cir. 1988) (holding where "three blows were struck in such rapid succession that [the defendant] had no realistic opportunity to prevent them," the defendant could not be liable for use of excessive force for failure to intercede).  In opposition to summary judgment, Plaintiff argues that, despite the lack of any time in which to prevent Zehler from punching Plaintiff after Plaintiff entered the lobby at the direction of Corrections Officers, the premeditated nature of the assault establishes that Holtz knew the assault was planned and had ample time to take steps to prevent the plan from being carried

out.  Plaintiff's Memorandum at 17.  In further support of summary judgment,

Defendants argue that Plaintiff has offered nothing more than mere conjecture and

surmise in support of his argument that Holtz was aware of and willingly participated in

the alleged planned assault on Plaintiff on November 20, 2011, which is insufficient to

avoid summary judgment.  Defendants' Reply at 4.

It is undisputed that "a correctional officer has an affirmative duty to intercede on

behalf of an inmate if the officer witnesses another officer assault the inmate in violation

of the inmates' Eighth Amendment rights." *Durran v. Selsky*, 251 F.Supp.3d  1208,

1213 (W.D.N.Y. 2003) (holding plaintiff failed to show personal involvement of

corrections officer where plaintiff provided no evidence the corrections officer actually

witnessed the assault, yet failed to intervene).  In the instant case, there are genuine

issues of material fact regarding whether Holtz stood by and permitted the other

Corrections Officers to assault Plaintiff.  The cases to which Defendant points in which it

was determined that a short amount of time rendered it difficult, if not impossible, for a

corrections officer to react to a threat and prevent an assault on an inmate are readily

distinguishable from the instant case in which Plaintiff alleges that Holtz was among the

corrections officers who, by accompanying Zehler, manifested his intention to facilitate

the ensuing assault.  Further, Ulmer's statements, based on his own observation, that

on November 20, 2011, Plaintiff was called out of his cell and directed to the lobby at

7:00 P.M., Ulmer Affidavit ¶¶ 3-5, would be consistent with a jury's determination that

Holtz participated in a planned assault to be carried out against Plaintiff when the

majority of the other inmates were in the correctional facility's yard and, thus, would not

be able to witness Plaintiff's return to his cell after sustaining a planned injury.

Accordingly, summary judgment should be DENIED insofar as Plaintiff alleges Holtz failed to protect Plaintiff from the November 20, 2011 assault.

## **CONCLUSION**

Based on the foregoing, Defendants' motion (Dkt. 22), should be DENIED in part and GRANTED in part; the case should proceed to trial.

Respectfully submitted,

/s/ *Leslie G. Foschio*

_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:      April 21, 2016
            Buffalo, New York

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of service of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(d) of the Federal Rules of Civil Procedure and Local Rule 72.3.

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.**

*Thomas v. Arn,* 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Limited,* 838 F.2d 55 (2d Cir. 1988).

Let the Clerk send a copy of this Report and Recommendation to the attorneys for the Plaintiff and the Defendants.

SO ORDERED.

/s/ *Leslie G. Foschio*

_____

LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:    April 21, 2016
              Buffalo, New York